## BECKMAN v. SOUTHERN PACIFIC COMPANY.

No. 2228. Decided September 22, 1911 (118 Pac. 118).

1. CARRIERS—CARRIERS OF LIVE STOCK—DUTY AS TO FOOD, WATER, AND REST—STATUTORY PROVISIONS. Under 34 Stat. 607 (U. S. Comp. St. Supp. 1909, p. 1178), which provides that every railroad company carrying an interstate shipment of live stock shall, at intervals of not less than twenty-eight hours, unload it into properly equipped pens for rest, water, and feeding, for a period of at least five consecutive hours, unless prevented by storm or other accident or unavoidable cause which cannot be averted by due diligence, the carrier is not made an absolute insurer of the safety of sheep in transit, but its duty is fully performed by providing pens properly equipped, unless it has

notice, or by reasonable diligence could have discovered, that the surrounding conditions were such that injury to the sheep, while in the pens, from dogs or wild animals, might be expected, in which case it would be bound to make reasonable provision for their safety. (Page 478.)

2. CARRIERS—CARRIERS OF LIVE STOCK—ACTION—BURDEN OF PROOF. In an action for injury to an interstate shipment of sheep while in pens for rest, water, and feeding, by dogs or wild animals, which broke into the pens and killed and worried the sheep, *held*, that the shipper had not sustained the burden of proving that the carrier, in providing the pens for such purposes, as required by 34 Stat. 607 (U. S. Comp. St. Supp. 1909, p. 1178), was negligent in not protecting the sheep from such injury. (Page 481.)

APPEAL from District Court, Second District; *Hon. J. A. Howell*, Judge.

Action by William Beckman against the Southern Pacific Company.

Judgment for defendant. Plaintiff appeals.

AFFIRMED.

*H. H. Henderson* for appellant.

*P. L. Williams, Geo. H. Smith* and *Frank K. Nebeker* for respondent.

FRICK, C. J.

This was an action for damages for injury to sheep at Reno, Nev., while in transit from Ogden, Utah, to San Francisco, Cal.

The material allegations respecting respondent's delict are as follows: "That the defendant, disregarding its duty to provide proper, safe, adequate, and sufficient stockyards, carelessly and negligently furnished unsafe, broken down, inadequate stockyards, and carelessly and negligently failed to provide a guard or watchman for said stockyards, so that,

by reason of the carelessness and negligence of the defendant aforesaid, during the nights of March 1st and 2d, dogs or wild animals broke into said stockyards, and chased, tore, and mangled said sheep, so that eighty-seven of said sheep were killed in said stockyards, and that seven others were so badly torn and mangled that they died soon thereafter, to plaintiff's damage in the sum of $644.85." It is further alleged that the rest of the sheep, to wit, 1617 head, were chased and worried by said dogs or wild animals, so that they lost in flesh and depreciated in value.

In answering, respondent admitted that it had received certain lambs at Ogden, Utah, for transportation, and had transported them to San Francisco. Respondent set up various defenses in its answer, one of which was that the lambs were received by it and were transported under a special contract, in writing, duly entered into and executed by appellant and respondent. The portions of the contract especially relied on by respondent are as follows: "Now, therefore, second party, for and in consideration of the premises and the rates hereinbefore named, and the service to be performed hereunder, and other good and sufficient considerations (in case of car load shipment carriage of man or men in charge at reduced rates, or free, as rules may provide) hereby agrees to *load said live stock at point of shipment, unload and reload at resting places, and unload at destination, and to feed and water at his expense, and to accompany and attend said live stock en route and to destination.* . . . It is further understood and agreed by second party that the live stock covered by this special agreement is to be transported subject to the conditions of state, territorial or federal laws governing the transportation, unloading and resting of live stock en route; and in case first party should, through its employees, furnish aid to assist in loading, caring for en route, unloading or transferring said live stock, said employees of first party so assisting or performing services shall be subject to the orders and deemed the employees of second party while so engaged, and not in any sense the agents of first party; and when live stock is in corrals at shipping

point, resting place or destination, it shall be at owner's risk of loss or damage through breaking out of corrals or in loading and unloading." The italicized part of the foregoing contract is printed in bold-faced type.

Basing its answer on the foregoing provisions in the contract, respondent also averred that at the time the lambs were injured they were in appellant's care, custody, and control, and that it was his duty to protect them from injury, and averred that he was guilty of negligence causing or directly contributing to the injury; and for further answer respondent denied all negligence on its part. Appellant in his reply denied all the averments contained in the answer, except that the lambs were shipped pursuant to the contract referred to by respondent.

In order that we may have a clearer conception of the precise claim appellant makes in this case, we copy from the transcript of the proceedings had in the court below. When the court asked Mr. Henderson, one of appellant's counsel, upon what specific ground he relied for a recovery, Mr. Henderson answered thus: "Upon the ground that they (respondent) didn't have adequate fences or yards, and they didn't have any guard." Then the record discloses the following conversation between court and counsel: "The Court: You mean adequate in that particular, that animals or dogs got through? Mr. Henderson: Yes. The Court: That is to say, if the court should hold as a matter of law, that the railroad company is not under any duty to furnish a fence that would keep dogs out or wild animals, and should also hold that it was not required to have a watchman, that settles the case? Mr. Henderson: That's all I rely on. That's all I have got to rely on." It seems that both the appellant and respondent limited the evidence to the issues outlined above. After the evidence was all submitted by both sides, respondent moved for a directed verdict upon various grounds, which, in view that their sufficiency is not assailed; we deem unnecessary to state in full. The court granted the motion and directed the

jury to return a verdict for respondent, to all of which appellant duly excepted.

The principal error assigned is that the court erred in directing a verdict for respondent.

The shipment in question constituted an interstate shipment of live stock, and such shipments are controlled by the following provisions: "That no railroad company . . . whose road forms any part of a line of road over which cattle, sheep, swine or other animals shall be conveyed from one state or territory . . . into or through another state or territory . . . shall confine the same in cars, boats or vessels of any description for a period longer than twenty-eight consecutive hours, without unloading the same in a humane manner into properly equipped pens for rest, water and feeding, for a period of at least five consecutive hours, unless prevented by storm or by other accidental or unavoidable causes which cannot be anticipated or avoided, by the exercise of due diligence and foresight." The foregoing quotation constitutes the material part of Pierce's U. S. Code, 1910, section 6463, also found in part 1 and 34 Stat. 607 (U. S. Comp. St. Supp. 1909, p. 1178).

The evidence with respect to what caused the injury to the lambs is, to say the least, quite unsatisfactory. The evidence is to the effect that the lambs arrived at Reno, Nev., on their way to San Francisco, on the 1st day of March, 1908, some time in the afternoon; that the lambs were unloaded there for rest and to be fed and watered; that appellant unloaded or helped to unload them, and an employee of respondent directed them to be driven into certain corrals or pens made of wood, and from three and a half to four feet high; that respondent had other pens or yards which were about ten or twelve feet high; that those "other yards which the defendant had were occupied by cattle and hogs." In speaking about the yards into which the lambs were placed, appellant, in his testimony, says: "I told the foreman of the yard—this man Lewis—that I wasn't satisfied with the security of the yard, and if there was any damage done I would make the company stand for it, and I called a witness to it. He said

those were the only yards that were empty." One of appellant's witnesses, in his testimony, in speaking of appellant's objection referred to above, says: "One of the particulars that he (appellant) mentioned was that there were no locks on the gates; the gates were just simply thrown back and fastened with a wire; and he said that any Indian or Dago could help themselves to sheep for mutton if they wanted to." Mr. Lewis, to whom appellant referred in his testimony, said that appellant made some objection that the water had not been turned in—that is, turned in to flow into the yards where the lambs were; but as soon as the water was turned into the yard to where the lambs were appellant was satisfied. The sheep were fed and watered in the yard, and were in good condition at about seven o'clock on the evening of March 1st, but when they were next seen on the following morning at about seven or seven-thirty o'clock eighty-seven of them were dead, and were lying together in one corner of the fence. Some of the dead ones had considerable of their wool torn off, and some were more or less wounded and bruised, and appeared as though they had been bitten by some sharp-toothed animals. The rest of the sheep appeared tired out and "logy," and were in bad condition generally. The gates were closed. There was no evidence of any interference with the fence, and the lambs were all in the pen. It seems that no dogs or other wild animals were seen or heard by any one. This is the substance of the evidence relating to the condition of the yards, the injury to the lambs, and the inference as to how they were injured. No complaint is made that any of the lambs suffered injury by reason of any particular defect in the yards or fence, or that they were insufficient to retain the lambs, or that the yards were in an unfit or unclean condition, or that the lambs got out and were injured in that way. The only claims made by appellant are that the yards were insufficient, in that they did not keep out vicious dogs or wild animals; that it was the duty of respondent to furnish yards which would keep out vicious dogs or wild animals, or at least to provide a watchman or guard who would watch the sheep and prevent injury to them from such source.

The question therefore is, What is respondent's duty with respect to providing pens for the purpose of permitting shippers of live stock to feed, water, and rest such stock when it becomes necessary during transit? It will be observed that the statute to which we have directed attention does not in terms provide the kind or character of pens the carrier shall provide, except that the same must be "properly equipped pens for rest, water, and feeding." In the case of *United States v. St. Louis, I. M. & S. Ry. Co.,* 177 Fed. 205, 101 C. C. A. 375, the United States Court of Appeals for the Eighth Circuit, in considering the question with respect to the character of equipment which a carrier must provide in furnishing pens under the statute we have quoted, says:

"It (the statute) contains no provision requiring the carrier to maintain any particular kind of equipment of its stock pens, permanent or otherwise. The condition of the pens seems to have concerned Congress in making the enactment so far, and so far only, as it served the dominant and humane purpose of properly feeding, watering, and resting the stock. The equipment of the pens must be such, and need be only such, as serves that purpose at the time the stock is unloaded into them."

In 2 Hutchinson on Carriers (3d Ed.), section 510, the author, in speaking of the carrier's duty with regard to the shipment of live stock, states the law clearly and tersely as follows:

"In the case of a carrier of live stock, it includes the furnishing of proper yards, pens, gates, and other appliances necessary to enable the stock to be received, loaded, unloaded, and delivered to the consignee. In providing pens at any point, however, the carrier is only required to anticipate and make reasonable provision for the volume of live stock business which he ordinarily and usually transacts at such point. It is also his duty to keep the pens so furnished by him in a suitable condition for the purpose for which they are intended. Thus, if he should permit the pens to become so out of repair that the live stock placed within them break out and are injured, he will be liable to the shipper for such injury."

A careful examination of a large number of cases convinces us that the author, in the foregoing excerpt, has stated

the law upon the subject correctly and with admirable precision. Some of the cases are based upon state statutes, while others are based upon the common-law duties of the carrier. A large number of cases are collated by Mr. Hutchinson, and we refer the reader to his citations.

It seems to us that, unless respondent is by law required to keep live stock free from all harm while the same are being fed and watered, under the statute, while in transit, then, in view of the evidence in this case, respondent cannot be held liable, for the following reasons: There is no evidence whatever that there were any vicious dogs or wild animals of any kind in or near Reno which might or probably would molest the lambs in question. Reno is a city, as the evidence shows, of 15,000 inhabitants, and is an old established place. Under such circumstances, no one would expect that either vicious dogs or wild animals would abound in large or any considerable numbers, if at all. True it is claimed that vicious dogs or some wild animals did injure and kill some of the sheep; and hence there were such dogs or animals there. It seems to us, however, that the material inquiry is, What was the prevailing condition in or in the immediate vicinity of Reno with regard to the prevalence of vicious dogs or wild animals whose natural propensities would lead them to attack and injure sheep? It cannot be doubted that, had appellant made the attempt, he could have found at least some persons out of the 15,000 inhabitants of Reno who could have informed the court and jury with regard to such condition, or with regard to whether there had been similar previous occurrences at the yards at Reno. Had such evidence been produced, then, no doubt, the respondent, through its agents and representatives at Reno, would have been bound to take notice of the prevailing condition in that regard, and, as we think, would have been required by law to make reasonable provision to protect the sheep.

This conclusion is based upon the federal statute which we have quoted. The statute requires the respondent to furnish properly equipped pens; equipped to answer the following purposes: To afford rest, to provide means or facilities to

water, and to feed stock. As we have seen, the pens in question were properly equipped to feed and water the sheep, and, as far as the evidence discloses, nothing is shown why they were not also inherently sufficient to afford the required rest. If the pens were not sufficient in that regard, it was because there were vicious dogs or some wild animals that broke into the pens during the nighttime, and chased, harassed, worried, wounded, mutilated, and killed some of the sheep. If there were vicious dogs or wild animals in considerable numbers in or near the City of Reno, whose natural propensities were to injure sheep, and it was generally known that such animals and dogs were prevalent there, then any one could infer that they might and probably would break into the pens when occupied by sheep, and, if so, would chase, worry, and injure them. If such were the fact, then pens like those into which the sheep in question were unloaded at Reno were not sufficient, because not such as would afford proper rest for the sheep. So far as the evidence goes, however, it would seem that the occurrence at Reno was extraordinary. Is respondent required to meet every possible emergency that may arise whereby a shipment of sheep may suffer injury from vicious dogs or wild animals when unloaded for feed, water, and rest? We think not. We are of the opinion that if the pens provided by the carrier are properly equipped, so that the sheep may be properly fed, watered, and rested, he has discharged his full duty, unless it is made to appear that the surrounding conditions were such that the carrier should have anticipated that the sheep would probably be molested, and thus not afforded proper rest. If such is not the law, then the carrier is made an absolute insurer of the safety of the sheep while unloaded for food, rest, and water, regardless of the fact that by the exercise of reasonable diligence he did not know, and could not have discovered, the threatened danger to which the sheep may be exposed. In our judgment, such is not the meaning or purpose of the statute. It will be seen that the statute in terms excuses the carrier for things which are accidental or unavoidable, and which could not be anticipated or avoided by the "exercise of due diligence and fore-

sight." Of course, if such an excuse is good as against the duty to provide means and facilities to feed and water, it likewise must be good as against the duty to provide means for rest.

We are of the opinion, therefore, that, in order to hold a carrier liable for some cause which does not arise out of some defect which inheres in the pens themselves, such as being infected with disease, or of insufficient strength to hold the stock, or when rest is impossible because of some improper condition of the pens, the shipper must show that the carrier, by the exercise of "due diligence and fore- **2** sight," could have avoided the injury to the stock. The shipper must show that the carrier was guilty of negligence which was the cause of the injury. Had it been shown in this case that vicious dogs or wild animals, whose natural propensities were such as to injure sheep, were prevalent at Reno, and that respondent knew or ought to have known that such was the case, or if it had been shown that occurrences of a like character had taken place within a reasonable time prior to the time in question, then the jury might probably have inferred negligence on the part of respondent in not providing pens which would protect the sheep from interference. Such seems, also, to have been the theory of counsel for appellant when they prepared the complaint, as in it they based their right to recover upon the fact that respondent was guilty of negligence. It was only when they came to try the case that they insisted that the duty of the respondent was an absolute one, enforceable under all conditions. We cannot agree with counsel's theory, as contended for at the trial and in this court, for the reasons we have stated.

In view of the conclusions reached, the other errors assigned are immaterial, and hence require no discussion. Nor is it necessary to consider what effect, if any, the provisions of the contract which we have quoted from would have as between the parties. Since we have reached the conclusion that respondent is not liable under the statute, even though the sheep were in its charge, it is wholly immaterial at this time

39 Utah—31

to determine whether the shipper and carrier may by contract shift the burden imposed by the statute from the latter to the former.

From what has been said, it follows that the judgment should be, and it accordingly is, affirmed, with costs to respondent.

McCARTY, J., concurs. STRAUP, J., concurs in the result.